## EXHIBIT A

**APA**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into as of this 11th day of December, 2014 (the "Effective Date") by and among Adams Street Lofts, LLC, a Florida limited liability corporation, a debtor in possession under chapter 11 of the United States Bankruptcy Code ("Seller"), and Governance Services, LLC, a limited liability company ("Buyer").

### Recitals

WHEREAS, Seller is in the real estate business and developed and sells condominium units located at 420 North Adams Street in Tallahassee, Florida, consisting of 31 units (the "Project"); and

WHEREAS, of the 31 units, 17 units remain unsold, and are owned by Seller and are currently being rented, including the following units located at 420 North Adams Street, Tallahassee, Florida 32301: Unit 506, Unit 302, Unit 503, Unit 103, Unit 504, Unit 203, Unit 307, Unit 305, Unit 301, Unit 501, Unit 201, Unit 303, Unit 204, Unit 304, Unit 202, Unit 306, and Unit 206; and

WHEREAS, on August 22, 2014 (the "Petition Date"), Seller filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Florida (the "Bankruptcy Court"), Case No. 14-40483 (the "Bankruptcy Case"), and Seller is currently operating the Project as debtor in possession thereunder; and

WHEREAS, Seller desires to sell to Buyer and Buyer desires to purchase from Seller substantially all of the assets of Seller on the terms and conditions set forth herein and as authorized under §§ 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, Seller believes, following consultations with its advisors and consideration of its alternatives, in light of the current circumstances, that a sale of all of or substantially all of its assets is necessary to maximize value and is in the best interests of Seller and its estate, creditors, and parties-in-interest; and

WHEREAS, Seller has been actively marketing and soliciting bids for the sale of Seller's assets, and has determined that the offer of Buyer for the assets to be sold pursuant to this Agreement is the highest and best offer (in accordance with §363 of the Bankruptcy Code) received for the assets and constitutes a fair and adequate purchase price for such assets;

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE 1
## DEFINITIONS

In addition to the terms defined elsewhere in this Agreement, for purposes of this Agreement the following terms shall have the following respective meanings:

"Acquired Assets" has the meaning set forth in Section 2.1.

"Acquired Contracts" has the meaning set forth in Section 2.1(a).

"Acquired Equipment" has the meaning set forth in Section 2.1(c).

"Acquired Inventory" has the meaning set forth in Section 2.1(b).

"Acquired Permits" has the meaning set forth in Section 2.1(e).

"Acquired Deposits" has the meaning set forth in Section 2.1(g).

"Affiliate" means, with respect to any specified or applicable Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such specified or applicable Person.

"Agreement" has the meaning set forth in the opening paragraph of this document.

"Applicable Law" means any statute, law, rule, regulation, or ordinance or any Order of any Governmental Entity to which a specified Person or property is subject.

"Assumed Liabilities" has the meaning set forth in Section 2.4.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" and "Bankruptcy Court" have the meanings set forth in the Recitals.

"Business Day" means a day, other than a Saturday, Sunday or federal holiday, on which major banks are open for business in Tallahassee, Florida.

"Buyer's Closing Certificate" has the meaning set forth in Section 4.3(c).

"Closing" means the consummation of the purchase and sale and assignment of the Acquired Assets and assumption of the Assumed Liabilities, as contemplated by this Agreement, on the Closing Date.

"Closing Date" means the date on which the Closing occurs.

"Code" means the Internal Revenue Code of 1986, as amended and in effect on the Closing Date.

2

"Consents" means all consents and waivers of third parties (other than the Bankruptcy Court or Governmental Entities) that are required to be obtained prior to or in order to effect the transactions contemplated herein, including, without limitation, the valid assignment, transfer and conveyance from Seller to Buyer of any of the Acquired Contracts, in each case without causing a default, breach or loss of material rights thereunder which could reasonably be expected to have a Material Adverse Effect.

"Cure Costs" means the amount required to cure defaults under the Acquired Contracts as required for a Seller to assume and assign such Acquired Contracts to Buyer at Closing, as determined by agreement between the Seller and the applicable contracting party or by the Bankruptcy Court.

"Deposit" has the meaning set forth in Section 3.1 with respect to Buyer, and means the amount that is ten percent (10%) of the cash purchase price.

"Escrow Agent" has the meaning set forth in Section 3.1.

"Excluded Accounts" has the meaning set forth in Section 2.2(a).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.2(b).

"Excluded Liabilities" has the meaning set forth in Section 2.5.

"Execution Date" means the date of this Agreement.

"Final Order" means an Order of the Bankruptcy Court, or other court of competent jurisdiction, the operation or effect of which has not been reversed, stayed, modified, amended, vacated, or supplemented and as to which Order the time to appeal or seek review, rehearing, reargument or certiorari has expired and as to which no appeal or petition for review, rehearing, reargument or certiorari has been timely filed and remains pending.

"Governmental Entity" means any court or tribunal in any jurisdiction (domestic or foreign) or any public, governmental, legislative or regulatory body, agency, department, commission, board, bureau, or other authority or instrumentality (domestic or foreign).

"Governmental Approvals" means those approvals, authorization and exemptions from Governmental Entities and the making of all necessary registrations and filings (including filings with Governmental Entities) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding to prevent the Closing by, any Governmental Entity, which are required to be obtained or taken to consummate the transactions contemplated herein under Applicable Law.

5888178-5

"Intellectual Property" means all intellectual property owned by Seller, including, without limitation, trade names, styles, logos, copyrights, and trademarks, which are useful and necessary in operating the Project.

"Lien" means any interest (other than that of Seller), claim, encumbrance or lien relating to the Acquired Assets, as those terms are used in §§ 101(37) and 363(f) of the Bankruptcy Code.

"Material Adverse Effect" and "Material Adverse Change" means an occurrence or event that materially adversely affects the value of the Acquired Assets taken as a whole, or that materially adversely affects the ability of a party hereto to perform its obligations under this Agreement or timely consummate the transactions contemplated herein, and excludes any such effect resulting, directly or indirectly, from (i) the Bankruptcy Case and circumstances related thereto, or (ii) factors affecting the economy or financial markets or Seller's industry as a whole.

"Order" means any writ, judgment, decree, injunction or similar order, writ, ruling directive or other requirement of any Governmental Entity (in each such case whether preliminary or final).

"Permits" means all permits and licenses relating to the Project.

"Permitted Liens" means any Lien for Taxes not yet due or payable.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, enterprise, unincorporated organization, Governmental Entity, or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Purchase Price" has the meaning set forth in Section 3.2(a).

"Related Agreements" means documents to be executed and delivered at Closing as contemplated hereby, including the Bill of Sale and the Assignment and Assumption Agreement.

"Retained Liabilities" shall have the meaning set forth in Section 2.3.

"Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Approval Hearing" means the hearing on the entry of the Sale Order.

"Sale Motion" means the motion of Seller, in form and substance acceptable to Seller and Buyer in their reasonable discretion, for, among other things, entry of an Order authorizing the sale of the Acquired Assets free and clear of Liens (other than Permitted Liens).

"Sale Order" means an order of the Bankruptcy Court (a) authorizing Seller to close on the terms of this Agreement and the transactions contemplated hereby, in accordance with § 363

of the Bankruptcy Code, which finds, among other things, that Buyer is a good-faith purchaser for value and otherwise entitles Buyer to the protections of § 363(m) of the Bankruptcy Code, and which order has not been reversed or modified on appeal or, if any such appeal is pending, such order shall not have been stayed, (b) approving the sale of the Acquired Assets to Buyer free and clear of any and all Liens (other than Liens that Buyer has agreed to permit or assume hereunder or hereafter) pursuant to § 363(f) of the Bankruptcy Code; (c) determining the Cure Costs and approving the assumption and assignment to Buyer of the Acquired Contracts solely on the terms of such Acquired Contracts; (d) providing that the provisions of Rules 6004(h) and 6006(g) of the Rules are rendered inapplicable and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure; (e) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement; and (f) determining this Agreement (as it may be modified prior to the Sale Approval Hearing) to be the highest and best bid as a result of the Auction.  The form of Sale Order shall be in form and substance acceptable to Buyer and Seller in their reasonable discretion.

"Seller's Closing Certificates" shall have the meaning set forth in Section 4.2(d).

"Seller's Knowledge" or "Knowledge of Seller" means the actual knowledge of the Seller without independent investigation.

"Tax" or "Taxes" means all taxes, charges, fees, duties, levies or other assessments, however denominated, imposed by any federal, territorial, state, local or foreign government or any agency or political subdivision of any such government, which taxes shall include, without limiting the generality of the foregoing, income or profit, gross receipts, net proceeds, ad valorem, turnover, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, business license, user, transfer, fuel, environmental, excess profits, occupational, interest equalization, windfall profits, severance and employees' income withholding, workers' compensation, Pension Benefits Guaranty Corporation premiums, unemployment and Social Security taxes, and other obligations of the same or of a similar nature to any of the foregoing (all including any interest, penalties or additions to tax related thereto imposed by any taxing authority).

## ARTICLE 2
## PURCHASE OF ASSETS

2.1   Purchase and Sale of Acquired Assets.  Subject to the Bankruptcy Court's authorization of Seller to close on this Agreement and to consummate the transactions contemplated hereby pursuant to the Sale Order, and upon the terms and subject to the conditions contained in this Agreement, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, assume and acquire from Seller, free and clear of all Liens (except for Permitted Liens) pursuant to §§ 363(b) and 363(f) of the Bankruptcy Code (including, without limitation, claims for successor liability under any theory of law or equity, and claims that Buyer is not a good faith purchaser entitled to the protections of § 363(m) of the Bankruptcy Code), all of Seller's transferable right, title and interest in and to the Acquired Assets.  "Acquired Assets" means all of Seller's transferable interest in assets, tangible or intangible, real, personal or mixed,

of any kind and description, and wherever located, that are used in connection with operating the Project (subject to adjustments through Closing as contemplated by this Agreement), excluding the Excluded Assets, but including without limitation the following:

(a)     Prior to Closing Buyer shall provide a list of the agreements and contracts relating to the Project that it wishes to acquire (the "Acquired Contracts") (and Seller shall assume in the Bankruptcy Case any Acquired Contracts and assign such Acquired Contracts to Buyer at Closing, subject to the provisions of Section 5.1 hereof);

(b)     all inventory relating to the Project, wherever located (the "Acquired Inventory");

(c)     all fixtures, machinery, equipment, furniture, supplies and tangible personal property owned by Seller and used in connection with the Project, wherever located (the "Acquired Equipment");

(d)     all files, papers, computer files, customer lists and records, advertising materials, promotional materials, studies, reports and books and business records of Sellers in any medium relating to the Project (subject to Seller's rights to access such files and records under Section 6.2, below, and except for books and records relating to Company Plans);

(e)     all Permits to the extent they are freely assignable (collectively, the "Acquired Permits");

(f)     all Intellectual Property used by Seller in connection with the Project and all registered trade names and trademarks held by Seller to the extent they are freely assignable (the "Acquired Intellectual Property");

(g)     all prepaid expenses related to the Acquired Assets, and, to the extent transferable, all deposits posted with utility companies, lessors, vendors or suppliers relating to the Project, including any changes in the amount of any such deposit as of the Closing (collectively, the "Acquired Deposits");

(h)     all rights of Seller under any insurance policies maintained by Seller relating solely to the Acquired Assets and Acquired Contracts, to the extent they are freely assignable;

(i)     all prepaid rent, accounts receivable due from and deposits received from any lessees/tenants related to the Acquired Assets; and

(j)     17 parking spaces (one per unit sold).

2.2     Excluded Assets.  Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement, the following assets (the "Excluded Assets") are not part of the sale and purchase contemplated hereunder, are excluded from the Acquired Assets, and shall remain the property of Seller after the Closing:

5888178-5

(a)     all accounts receivable, excluding the lessee/tenant rent and deposit receivables, arising from the operation of the Project prior to Closing, including, without limitation, those arising under the Acquired Contracts (collectively, the "Excluded Accounts");

(b)     all of Seller's interest in any agreements and contracts relating to the Project listed on Schedule 2.2(b) or subsequently designated as an Excluded Contract (A) by mutual consent of Buyer and Seller or (B) by Buyer's modification of Schedule 2.1(a) from time to time following the execution of this Agreement, by notice given to Seller at least five (5) Business Days prior to the Sale Approval Hearing, to delete any previously designated Acquired Contract therefrom; provided that no such modification shall change or affect the Purchase Price in any respect, in each case to the extent the same are not assumed by Seller and assigned to Buyer at or prior to the Closing (the "Excluded Contracts"), and including any accounts receivable arising under any Excluded Contracts;

(c)     all rights of Seller under any insurance policies maintained by Seller relating to the Project (except as otherwise provided under Section 2.1(h) and regarding casualty insurance proceeds relating to the Acquired Assets);

(d)     claims for any federal, state, local or foreign Tax refunds, rebates, abatements or other recovery for Taxes of Seller, together with any interest due thereon or penalty rebate arising therefrom, all Tax refunds, rebates, or other recoveries of Seller for any period, and all of Seller's rights and claims against third parties that have arisen or accrued at any time prior to Closing;

(e)     all of Seller's rights under this Agreement and/or the Related Agreements (including but not limited to rights relating to the Purchase Price);

(f)     all deposits, including cash deposits with vendors, utilities, and lessors that are not transferable, and any deposits related to any Excluded Assets owned or leased by Seller, and all of Seller's' prepaid expenses and deposits relating to Excluded Assets;

(g)     all bank accounts of Seller and all cash, cash equivalents, and short-term investments;

(h)     all minute books, stock records, and corporate seals;

(i)     all rights in connection with and assets of the Company Plans, and Seller shall retain and not sell or deliver to Buyer the books, records, and files relating to the Company Plans or any other confidential personnel information;

(j)     all commercial tort claims; and

(k)     all claims and avoidance recovery, subordination or other actions arising out of the commencement of the Bankruptcy Case, including without limitation those arising under §§ 506, 510, 542 - 551 and 553 of the Bankruptcy Code.

5888178-5

Seller expressly retains the rights to enforce and exercise their remedies pursuant to any of the Excluded Assets.

2.3    Retained Liabilities.  Seller shall retain the Retained Liabilities, and Buyer shall have no liability therefor. "Retained Liabilities" shall mean every liability of Seller other than the Assumed Liabilities.

2.4    Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing Buyer shall assume and agree to pay, perform and discharge the following liabilities and obligations of Seller (the "Assumed Liabilities"):

(a)    all payment and performance obligations arising after the Closing under the Acquired Contracts, the Acquired Permits and the Acquired Intellectual Property in accordance with the terms of the applicable Acquired Contracts, Acquired Permits and Acquired Intellectual Property;

(b)    all liabilities and obligations arising as a result of Buyer's acquisition or operation of the Acquired Assets and accruing after the Closing Date;

(c)    Cure Costs in respect of Acquired Contracts; and

(d)    any other liabilities specifically imposed upon Buyer pursuant to this Agreement.

2.5    Excluded Liabilities.  Except for the Assumed Liabilities, Buyer shall not assume any other liability of obligation of Seller of whatever nature, whether presently in existence or arising hereafter.   All such other liabilities and obligations (collectively, the "Excluded Liabilities") shall be retained by and remain liabilities and obligations of Seller, including outstanding dues owed to Adams Street Lofts Condominium Association, Inc., as applicable. The Excluded Liabilities include, without limitation:

(a)    payment and performance obligations arising or accruing in respect of periods prior to the Closing under the Acquired Contracts, the Acquired Permits and the Acquired Intellectual Property; and

(b)    any liabilities or obligations that do not relate to any Acquired Assets.

2.6    "As Is" Transaction.  Buyer hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Assets, or otherwise relating to any of the transactions contemplated hereby, including without limitation any income to be derived or expenses to be incurred in connection with the Acquired Assets, the physical condition of any Acquired Assets comprising a part of the Acquired Assets or which is the subject of any Acquired Contract, the value of the Acquired Assets (or any portion thereof), the terms, amount, validity or enforceability of any Assumed Liabilities, the merchantability or fitness of the Acquired Assets or any other portion of the Acquired Assets for any particular purpose. Without in any way limiting the foregoing, subject to the representations, warranties and covenants expressly set forth in this Agreement, **Seller hereby disclaims any warranty,**

8

express or implied, relating to this transaction, including but not limited to implied warranties of merchantability or fitness for any particular purpose as to any portion of the Acquired Assets. Buyer further acknowledges that Buyer, at Buyer's cost and expense, conducted and completed an independent inspection and investigation of the physical condition of the Acquired Assets and all such other matters relating to or affecting the Acquired Assets and the Project as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Acquired Assets and entering into this Agreement, except for any representations and warranties, and covenants expressly set forth in this Agreement, Buyer is doing so based solely upon such independent inspections and investigations. Accordingly, subject to the representations, warranties, and covenants expressly set forth in this Agreement, Buyer will accept the Acquired Assets at the Closing *"AS IS," "WHERE IS," AND "WITH ALL FAULTS."*

## ARTICLE 3
## PURCHASE PRICE

3.1     Deposit.   Buyer will deliver to Seller's attorneys, Berger Singerman LLP ("Escrow Agent"), immediately the sum of $125,375.00, as and for the deposit hereunder (the "Deposit"), to be held in escrow by Escrow Agent and to be disbursed by Escrow Agent in accordance with the terms of this Agreement.  The Deposit is not refundable except due to a breach by the Seller

3.2     Purchase Price; Purchase Price Adjustment.

(a)     Upon the terms and subject to the conditions set forth in this Agreement, Buyer shall pay to Seller in cash at Closing the amount of $1,253,750.00 (the "Purchase Price"), subject to certain adjustments as set forth in this Article 3 and elsewhere in this Agreement. At Closing, Buyer shall also assume the Assumed Liabilities. At Closing, Buyer shall pay the Purchase Price to Seller by wire transfer in immediately available U.S. funds to the account designated by Seller, and Escrow Agent shall deliver the Earnest Money Deposit to Seller (the amount of which shall be credited against the Purchase Price payable by Buyer at Closing).

(b)     At Closing, personal property Taxes and lessee/tenant rent applicable to the Acquired Assets shall be pro-rated to the day preceding the Closing Date on the basis of the fiscal year for which assessed (or, if not available, based on the prior fiscal year). If such Taxes cannot be adjusted with certainty at the Closing because of the unavailability of information as to the amounts, Seller shall estimate such adjustments at Closing.

## ARTICLE 4
## CLOSING

4.1     Closing.   Subject to the satisfaction or waiver of the conditions set forth in this Agreement, the Closing shall occur upon satisfaction of the conditions to Closing but not later than February 13, 2015 in the offices of Escrow Agent (or on such other date and at such other time and place as the parties shall mutually agree in writing).

4.2     Seller's Deliveries at Closing.  At Closing, Seller shall deliver, or cause to be delivered, to Buyer the following items:

(a)     Warranty Deed

(b)     Bill of Sale;

(c)     Assignment and Assumption Agreement and such other bills of sale, assignments, certificates of title, documents, and other instruments of transfer and conveyance as may reasonably be requested by Buyer, each in form and substance reasonably satisfactory to Buyer and Seller and duly executed by Seller; provided that each such instrument of transfer, including the Bill of Sale, shall expressly provide that Seller shall have no liability in monetary damages thereunder;

(d)     certificates, dated as of the Closing Date and signed by an officer of each Seller in a corporate capacity, stating that all conditions specified in Section 9.2 have been satisfied;

(e)     such other instruments and documents as Buyer reasonably deems necessary in connection with the transactions contemplated by this Agreement; and

(f)     physical possession and control of the Acquired Assets as soon thereafter as possible.

4.3     Buyer's Deliveries at Closing.  At Closing, Buyer shall deliver, or cause to be delivered, to Seller the following items:

(a)     payment of the balance of the Purchase Price specified under Section 3.1;

(b)     the Assignment and Assumption Agreement (pursuant to which Buyer shall assume the Assumed Liabilities) and the other Related Agreements to be executed by Buyer;

(c)     a certificate, dated as of the Closing Date and signed by an executive officer of Buyer in corporate capacity, stating that the conditions specified in Sections 9.1 have been satisfied;

(d)     the resolutions duly adopted by the Board of Directors of Buyer (and any stockholders or other Persons whose consent is required) authorizing the execution, delivery and performance of this Agreement, the Related Agreements and any other agreement or instruments contemplated hereby or thereby, and the consummation of the transactions contemplated herein by Buyer; and

(e)     such other instruments and documents as Seller shall reasonably deem necessary in connection with the transactions contemplated by this Agreement.

4.4     Closing Costs.  In addition to any other costs to be borne by Seller pursuant to this Agreement, Seller shall pay the cost of obtaining the Sale Order.  In addition to any other costs to

10

be borne by Buyer pursuant to this Agreement, Buyer shall pay all Taxes applicable to, imposed upon or arising out of the sale or transfer of the Acquired Assets to Buyer and the other transactions contemplated by this Agreement (including, but not limited to, sales, use, gross receipts, and intangible Taxes), and all costs and expenses incurred by Buyer as a result of any financing obtained by Buyer. However, documentary stamp taxes are not included as a cost to Buyer or Seller, as they shall not be due and owing pursuant to 11 U.S.C. Section 1146(c). Buyer may select a closing agent of its choosing at its own expense. Except as set forth in this Section or elsewhere in this Agreement, each of the parties shall bear its own expenses and the expenses of its counsel and other agents in connection with the transactions contemplated hereby.

## ARTICLE 5
## BANKRUPTCY CASE

5.1     Consents.  Seller and Buyer shall use their commercially reasonable efforts prior to Closing to obtain all required Consents of third parties whose consent is required under § 365 of the Bankruptcy Code in order for Seller to validly assign the applicable Acquired Contract to Buyer at Closing (other than those obviated by the Sale Order).  All such necessary third party consents shall be in writing and executed counterparts thereof shall be delivered to Buyer promptly after Seller's receipt thereof but in any event prior to Closing.  Notwithstanding the foregoing or anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any lease or contract or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, notwithstanding the Sale Order or without the consent of a third party thereto, would constitute a default thereof or in any way materially adversely affect the rights of Buyer thereunder.  If such Consent is not obtained, or if an attempted assignment thereof would be ineffective or would materially adversely affect the rights thereunder, Seller shall use its commercially reasonable efforts after Closing to provide to Buyer the benefits under any such lease or contract.  Buyer shall pay any Cure Costs relating to Acquired Contracts that Buyer elects to have Seller assume and assign to Buyer, and will pay any additional costs resulting from any requirements (acceptable to the parties hereto and the third party to the applicable Acquired Contract) imposed by Buyer in connection with the assignment and assumption of any Acquired Contracts.  Buyer shall be responsible for complying with the provisions of §365(b)(1)(C)) of the Bankruptcy Code.

5.2     Approval of Settlement.  As a condition to the Seller agreeing to cancel the auction and sell the Acquired Assets to Buyer, Buyer unconditionally agrees to support the Seller's Motion to Approve Compromise and Settlement filed on November 17, 2014 in the Bankruptcy Case [ECF No. 62], as modified, to allow the individual unit owners to receive $165,000 of the settlement proceeds and Centennial Bank to receive $435,000 of the settlement proceeds (the "Settlement").  Buyer further understands and agrees that the closing on the Settlement will occur prior to the Closing.

## ARTICLE 6
## COVENANTS

11

6.1     Conduct and Preservation of the Acquired Assets. Except as provided in this Agreement (including this Section 6.1), or unless otherwise consented to by Buyer, which consent shall not be unreasonably delayed or withheld, and except as otherwise required, authorized or restricted pursuant to any Order of the Bankruptcy Court, during the period from the date hereof to the Closing, Seller shall cause the Project to be conducted consistent with its practice since the Petition Date and in the ordinary course of business and shall, consistent with its practice since·the Petition Date, the requirements of the Bankruptcy·Code and the orders of the Bankruptcy Court, (i) preserve the present business operations, organization and goodwill of the Business (but Seller shall not be required to make any payments or enter into or amend any contractual agreements, arrangements, or understandings to satisfy the foregoing obligation unless such payment or other action is required by or consistent with past practice since the Petition Date); (ii) in all material respects preserve, maintain, and protect the assets, rights, and properties included in the Acquired Assets; (iii) comply in all material respects with all post-petition contractual and other obligations applicable to the operation of the Business and the Acquired Assets; and (iv) comply in all material respects with Applicable Laws, insofar as they relate to the Acquired Assets.

6.2     Access to Books and Records. For a period of five years after the Closing Date, upon the request of Seller and upon reasonable prior notice for any reasonable purpose, Buyer shall provide Seller and Seller's representatives with access during normal business hours to the books and records of the Project (reflecting operations and transactions prior to the Closing) and shall allow Seller and Seller's representatives to make copies thereof at Seller's expense, provided that such access shall be in a manner so as not unreasonably to interefere with the normal business operations of Buyer. The provisions of this Section shall survive the Closing.

6.3     No Sale or Encumbrance of Acquired Assets. Except for Liens granted to Seller's prepetition and post-petition creditors in connection with the Bankruptcy Case (all of which such Liens shall attach and be transferred to the proceeds of the sale contemplated by this Agreement), Seller will not sell or further encumber any Acquired Assets, other than the sale of inventory in the ordinary course, or as provided in this Agreement or Order of the Bankruptcy Court.

6.4     Accounts Receivable: Payments Received. All amounts payable or attributable to services, goods or materials rendered, sold or provided by Seller to the customers of the Project, except lessee/tenant rental payments and deposits, prior to Closing under Acquired Contracts, or otherwise relating to the Project (the "Pre-Closing Receivables") shall be retained and remain the exclusive assets and property of Seller, after giving effect to the transactions contemplated by this Agreement.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Seller hereby represents and warrants to Buyer that, except as set forth in the Schedules attached hereto:

7.1     Organization, Standing, and Power. Seller is a corporation, organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has the requisite power and authority to carry on its business as now being conducted, except where the

5888178-5

failure to be so organized, existing or in good standing or to have such power or authority would not, individually or in the aggregate, have a Material Adverse Effect.

7.2    Authority. Upon entry of the Sale Order, Seller will have all requisite corporate power and authority to enter into this Agreement and the Related Agreements and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Related Agreements by Seller and the consummation by Seller of the transactions contemplated hereby and thereby have been or prior to Closing will be duly authorized by all necessary corporate action on the part of Seller or by Order of the Bankruptcy Court, subject to the conditions set forth in this Agreement. This Agreement has been duly executed and delivered by Seller and, upon entry of the Sale Order, will constitute the valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

7.3    No Conflict. Subject to entry of the Sale Order by the Bankruptcy Court or as otherwise contemplated by this Agreement, neither the execution, delivery or performance of this Agreement and the Related Agreements, the consummation of the transactions contemplated by this Agreement and the Related Agreements nor the compliance with the provisions hereof or thereof will (i) contravene, conflict with, or result in a violation of any provision of the certificate of incorporation of Seller (except if permitted or authorized by Order of the Bankruptcy Court), (ii) to Seller's Knowledge, conflict with or result in a breach of the terms, conditions or provisions of any Order of a Governmental Entity, or (iii) to Seller's Knowledge, result in the creation or imposition of any Lien on any of the Acquired Assets, except for those arising by, through or under Buyer.

7.4    Third-Party Approvals. Except for the Sale Order and as contemplated by the other provisions of this Agreement, the execution, delivery and performance by Seller of this Agreement and the Related Agreements and the transactions contemplated hereby and thereby do not require any Governmental Approvals or any consents, waivers, authorizations or approvals of, or filings with, any third parties which have not been obtained (or will not have been obtained at or prior to Closing) by Seller, except for those as to which the failure to obtain the same is not reasonably likely to have a Material Adverse Effect.

7.5    Acquired Contracts. To Seller's Knowledge, except for defaults caused by the commencement of the Bankruptcy Case or which are not reasonably likely to have a Material Adverse Effect, each Acquired Contract is valid and binding upon Seller and is in full force and effect.

7.6    Claims, Litigation, and Disputes. Except for the Bankruptcy Case, and Orders entered by the Bankruptcy Court, to Seller's Knowledge, there is no claim, litigation, action, grievance, arbitration, or other legal proceeding at law or equity or before any Governmental Entity or threatened against Seller, materially and adversely affecting (i) Seller's ability to perform their obligations hereunder, (ii) the rights granted under the Acquired Contracts, or (iii) the ownership, use, maintenance or operation of the Acquired Assets by Seller.

7.7    Compliance with Laws. To Seller's Knowledge the Project is in compliance with all Applicable Laws, except in any such case where the failure to be in compliance would not be reasonably likely to have a Material Adverse Effect.

5888178-5

7.8     Taxes.

(a)     To the extent that under Applicable Law the failure of this representation to be true or correct could result in a lien upon or claim against the Acquired Assets or in a claim against Buyer as transferee or owner of the Acquired Assets, (i) Seller has filed or has caused to be filed on a timely basis (or have timely requested an extension of time to file) all Tax returns that are or were required to be filed with respect to the Acquired Assets and the operation of the Project; (ii) all such Tax returns accurately reflect all liabilities required to be reflected thereon; and (iii) except for Taxes the payment of which would not be required pursuant to applicable exemptions or exceptions, including those provided by the Bankruptcy Code or otherwise by reason of the commencement or pendency of the Bankruptcy Case, all Taxes due and payable by Seller with respect to the Acquired Assets and the operation of the Project as shown in such Tax returns have been paid.

(b)     To the extent that under Applicable Law the failure of this representation to be true or correct could result in a lien upon or claim against the Acquired Assets or in a claim against Buyer as transferee or owner of the Acquired Assets, (i) no material deficiency or proposed adjustment which has not been settled or otherwise resolved for any amount of Tax has been proposed, asserted or assessed by any Governmental Entity against Seller with respect to the Acquired Assets and the operation of the Project and there is no action, suit, taxing authority proceeding or audit now in progress, pending or, to Seller's Knowledge, threatened against or with respect to Seller with respect thereto; and (ii) there are no Liens for Taxes (other than for current Taxes not yet due and payable or those being contested in good faith and by appropriate proceedings) upon the Acquired Assets.

7.9     Governmental and Regulatory Consents and Approvals. To Seller's Knowledge, other than the Bankruptcy Court, there is no Governmental Entity that must consent to the execution, delivery or performance of this Agreement by Seller, except where the failure to obtain any such consent of such Governmental Entity would not have a Material Adverse Effect or would not materially adversely affect the ability of Seller to consummate the transactions contemplated hereby.

7.10    Brokerage Fees. No broker, investment banker, or other Person engaged by Seller is entitled to any broker's, finder's or other similar fee or commission payable by Buyer in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

7.11    Acquired Assets. Seller has good title to the Acquired Assets, free and clear of all liens and encumbrances except for (a) Permitted Liens, and (b) Liens which will be released at Closing or transferred to the proceeds of sale of the Acquired Assets.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that:

8.1     Organization, Standing, and Power.    Buyer is a limited liability corporation organized, validly existing, and in good standing under the laws of Florida and has the requisite power and authority to carry on its business as now being conducted and to effect the transactions contemplated hereunder.

8.2     Authority.    Buyer has all requisite corporate power and authority to enter into this Agreement and the Related Agreements and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Related Agreements by Buyer and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Buyer, subject to the conditions set forth in this Agreement. This Agreement has been duly and validly executed and delivered by Buyer and this Agreement constitutes the legal, valid and binding obligation of Buyer and is enforceable against Buyer in accordance with its terms.

8.3     Consents and Approvals; No Violation.    Neither the execution, delivery or performance of this Agreement and the Related Agreements, the consummation of the transactions contemplated by this Agreement and the Related Agreements nor the compliance with the provisions hereof or thereof will, result in any violation of, or default (with or without notice or lapse of time, or both) under, or give to others a right of termination, cancellation or acceleration of any obligation or the loss of a material benefit under, or result in the creation of any Lien upon any of the properties or assets of Buyer under any provision of (i) the charter or organizational document or bylaws of Buyer, (ii) any loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise or license applicable to Buyer or (iii) any Order or Applicable Law relating to Buyer or any of its properties or assets, other than, in the case of clauses (ii) or (iii), any such violations, defaults or Liens that, individually or in the aggregate, would not prevent the consummation of any of the transactions contemplated hereby in accordance with the terms of this Agreement. No filing or registration with, or authorization, consent or approval of, any Governmental Entity is required by or with respect to Buyer in connection with the execution and delivery of this Agreement by Buyer or is necessary for the consummation of the transactions contemplated by this Agreement.

8.4     Actions and Proceedings.    There are no actions, suits, or other litigation, legal or administrative proceedings or governmental investigations pending or threatened against Buyer which could have the effect of delaying or prohibiting the consummation of the transactions contemplated by this Agreement.

8.5     Brokers.    No broker other than Sunbelt Investment Properties Corporation who has registered with Seller's auction broker, investment banker, or other Person engaged by Buyer is entitled to any broker's, finder's or other similar fee or commission payable by Seller in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer. This representation shall survive the Closing, and Buyer shall

indemnify and hold harmless Seller for any liabilities incurred by Sellers as a result of the inaccuracy of this representation.

      8.6    <u>Financing</u>. Buyer has (and, to the extent Buyer assigns its rights and obligations hereunder to Buyer's Assignee in accordance with the provisions of Section 12.7, Buyer's Assignee shall have) sufficient available funds to pay the Purchase Price at Closing and to perform its obligations under this Agreement.

**ARTICLE 9**
**CONDITIONS OF CLOSING**

      9.1    <u>Conditions to Obligations of Buyer to Proceed on the Closing Date</u>.   The obligations of Buyer to consummate the transactions provided for by this Agreement shall be subject to the satisfaction or waiver by Buyer, on or prior to the Closing, of each of the following conditions:

      (a)    Centennial Bank agrees on or before Closing to release the mortgage on the 41 parking spaces adjacent to the Project and the Debtor shall, subject to Section 2.1(j), convey the parking spaces to the individual unit owners or Adams Street Lofts Condominium Association, Inc. free and clear of the Centennial Bank lien;

      (b)    The representations and warranties of Seller herein shall be true and correct in all material respects when made and on the Closing Date with the same effect as though made at such time. Seller shall have performed in all material respects all of its obligations set forth in this Agreement and shall have complied in all material respects with all of their covenants and conditions set forth in this Agreement prior to or as of the Closing Date;

      (c)    There will have been no Material Adverse Change since the date of this Agreement;

      (d)    There shall be no material pending or threatened lawsuit, proceeding or governmental action challenging the transactions contemplated by this Agreement; and

      (e)    The Sale Order approving this Agreement and authorizing the transactions contemplated hereby shall have been entered by the Bankruptcy Court and shall be a Final.

      9.2    <u>Conditions to Obligations of Seller to Proceed on the Closing Date</u>.   The obligations of Seller to consummate the transactions provided for by this Agreement shall be subject to the satisfaction or waiver by Seller, on or before the Closing, of each of the following conditions:

      (a)    The representations and warranties of Buyer herein shall be true and correct in all material respects when made and on the Closing Date with the same effect as though made at such time. Buyer shall have performed in all material respects all its obligations set forth in this Agreement, and shall have complied in all material respects

16

with all its covenants and conditions set forth in this Agreement, prior to or as of the Closing Date;

(b)     All consents and approvals that are necessary to be obtained by Seller in order to authorize and effect the transactions contemplated by this Agreement shall have been obtained, except where the failure to obtain the same would not have a Material Adverse Effect;

(c)     There shall be no material pending or threatened lawsuit, proceeding or governmental action challenging the transactions contemplated by this Agreement;

(d)     The Sale Order approving this Agreement and authorizing the transactions contemplated hereby shall have been entered by the Bankruptcy Court;

(e)     The Buyer shall provide Seller an estoppel letter stating that all dues owed to Adams Street Lofts Condominium Association are current.

## ARTICLE 10
## TERMINATION, AMENDMENT, AND WAIVER

10.1    Termination. This Agreement may be terminated at any time prior to the Closing Date:

(a)     upon the mutual written consent of Buyer and Seller;

(b)     by Seller, if (i) at the execution of this Agreement or at Closing, the representations and warranties of Buyer in Article 8 shall not be true and correct in all material respects, or (ii) as of the Closing Date any of the conditions specified in Section 9.2 hereof have not been satisfied (unless such failure was solely within the control of Seller), or (iii) Buyer is in material breach of this Agreement, and such breach has not been cured within ten (10) Business Days following the delivery of written notice thereof to Buyer;

(c)     by Buyer, if (i) at the execution of this Agreement or at Closing, the representations and warranties of Seller in Article 7 shall not be true and correct in all material respects, or (ii) as of the Closing Date any of the conditions specified in Section 9.1 hereof have not been satisfied (unless such failure was primarily within the control of Buyer), or (iii) Sellers are in material breach of this Agreement, and such breach has not been cured within ten (10) Business Days following the delivery of written notice thereof to Seller;

(d)     by either Buyer or Seller if there shall be in effect a stay pending appeal or other Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated herein;

(e)     by Buyer or Seller if a motion to dismiss the Bankruptcy Case has been granted by the Bankruptcy Court;

(f)    by Buyer or Seller, if the Bankruptcy Court has not entered the Sale Order by February 15, 2015, or (ii) such longer period of time as the Bankruptcy Court may require pursuant to the Bidding Procedures Order; and

(g)    by Buyer or Seller, if the Bankruptcy Court has entered the Sale Order but the Closing Date has not occurred on or before the later to occur of (i) Five Business Days after entry of the Sale Order, or in all events by (ii) February 13, 2015, provided the terminating party is not in material breach of its obligations hereunder.

10.2    Effect of Termination.

(a)    If this Agreement is terminated pursuant to Article 10(c), (d), (e), or (f) of this Agreement then the Deposit shall be returned to Buyer, provided that Buyer is not in breach of this Agreement. Buyer's sole remedy shall be to receive a return of the Deposit. In no event whatsoever shall Seller be liable for monetary damages.

(b)    If (i) this Agreement is terminated pursuant to Section 10.1(a), (b) or (g) of this Agreement and such breach materially affects Seller's ability to complete Closing of the Acquired Assets, then the Deposit shall be delivered to Seller as liquidated damages and not a penalty. The parties recognize that the determination of damages in the event of a termination of this Agreement pursuant to Article 10 will be difficult and that the retention by Seller of the amount of the Deposit constitutes a reasonable estimate of such actual damages, and therefore liquidated damages and not a penalty. Payment of the Deposit to Seller in the event of a termination of this Agreement pursuant to the provisions of this paragraph Section 10.1(a),(b), or (g) shall be Seller's exclusive remedy under this Agreement in connection with any termination hereof.

(c)    If this Agreement is validly terminated in accordance with this Article 10, this Agreement shall terminate, Escrow Agent shall deliver the Deposit as provided herein, and each of the parties shall be relieved of their respective obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Seller; provided, however, that the provisions of this Agreement that specifically survive the termination of this Agreement shall continue to be enforceable.

### ARTICLE 11
### RISK OF LOSS

11.1    Risk of Loss. From the date hereof through the Closing Date, all risk of loss or damage to the property included in the Acquired Assets shall be borne by Seller, and thereafter shall be borne by Buyer. If any material portion of the Acquired Assets is destroyed or damaged by fire or any other casualty on or prior to the Closing Date, Seller shall give written notice to Buyer as soon as practicable after, but in any event within five Business Days of, discovery of such damage or destruction, identifying the affected Acquired Assets, the amount of insurance, if any, covering such Acquired Assets and the amount, if any, which Seller is otherwise entitled to receive as a consequence. If the loss of or damage to the assets so destroyed or damaged have a Material Adverse Effect, then Buyer shall have the right, exercisable prior to Closing by Buyer's

written notice to Seller no later than ten Business Days after receipt of Seller's notice hereunder, to terminate this Agreement upon notice to Seller, or accept such Acquired Assets in their destroyed or damaged condition in which event Buyer shall be entitled to the proceeds of any insurance or other proceeds payable with respect to such loss. In no event shall Buyer become entitled to any insurance proceeds in respect of any Excluded Assets.

## ARTICLE 12
## MISCELLANEOUS

12.1    Expenses. Except as otherwise provided elsewhere in this Agreement, each party shall pay its own expenses incident to this Agreement and the transactions hereby contemplated. In the event of any litigation between the parties arising out of this Agreement, the prevailing party shall be entitled to recover from the other party its court costs and reasonable attorneys' fees and expenses at the trial and all appellate levels.

12.2    Governing Law. This Agreement will be governed by and construed under the laws of the State of Florida and the provisions of the Bankruptcy Code, without regard to conflict-of-laws principles that would require the application of any other law.

12.3    Notices. Except as otherwise expressly provided in this Agreement, any notice required or permitted to be given under this Agreement by any party to any other party shall be in writing and shall be (i) personally delivered, (ii) sent postage prepaid by certified or registered mail, (iii) sent by overnight express carrier, next Business Day delivery guaranteed, or (iv) sent by facsimile transmission, in each case to the party being notified at its address and/or fax number as set forth below, or at such other address and/or fax number as the party being notified may have designated for such purpose in a notice given to the other parties. Such notice shall be deemed received upon the earliest of the following to occur: (i) upon personal delivery; (ii) on the third Business Day following the day sent, if sent by registered or certified mail; (iii) on the next Business Day following the day sent, if sent by overnight express courier, next Business Day delivery guaranteed; and (iv) on the day sent, or if such day is not a Business Day on the next Business Day after the day sent, if sent by facsimile transmission with telecopy confirmation of transmission received by sender. The notice addresses and fax numbers for the parties are:

If to Seller:          Adams Street Lofts, LLC
                       416 North Adams Street
                       Tallahassee, FL 32301
                       Attn: Jonathan Leoni
                       Fax No.: (850)224-4169

With a copy to:        Berger Singerman LLP
                       125 South Gadsden Street, Suite 300
                       Tallahassee, Florida 32301
                       Attn: Brian G. Rich, Esq.
                       Fax No.: (850) 561-3013

If to Buyer:           Paige Carter-Smith

                         Governance Services, LLC
                         502 N. Adams Street
                         Tallahassee, Florida 32301
                         Fax No.: (850) 222-1249

With a copy to:          Ronald A. Mowrey
                         Mowrey Law Firm, P.A.
                         515 N. Adams Street
                         Tallahassee, Florida 32301
                         Attn: Ronald A. Mowrey
                         Fax No.: (850) 561-6867

     12.4   Section and Other Headings.   Section or other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

     12.5   Schedules and Exhibits; Recitals.   Each schedule, exhibit, and annex attached hereto shall be deemed to be a part of this Agreement to the same extent as if set forth verbatim in the body of this Agreement. The recitals set forth in this Agreement are incorporated into and made a part of this Agreement.

     12.6   Severability.   If any provision of this Agreement should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

     12.7   Parties; No Third Party Beneficiaries.   This Agreement shall be binding upon and enforceable against, and shall inure solely to the benefit of, the parties hereto and their respective successors and permitted assigns, including any liquidating trustee, responsible person, or similar representative for the Sellers or the Sellers' estate appointed in connection with the Bankruptcy Case. Nothing herein shall confer any rights or remedies to any Person which is not a party hereto. Buyer may not assign its rights or obligations under this Agreement to any Person.

     12.8   Counterparts.   This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.

     12.9   Facsimile Signature.   This Agreement may be delivered by facimile or other electronic transmission with the same force and effect as an original signature.

     12.10   Further Assurances.   Subject to the terms of this Agreement and to any required approvals or orders of the Bankruptcy Court, each of Buyer and Seller will execute such further documentation or take such further actions as the other party may reasonably request to effectuate the transfer of the Acquired Assets and implement this Agreement.

     12.11   Exclusive Jurisdiction.   Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or

20

be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.3 hereof.

12.12   Non-Survival of Representations, Warranties, Covenants and Agreements. Except as otherwise specifically provided in this Agreement, the respective representations, warranties, and covenants of the Seller contained herein, or in any certificates or other documents delivered prior to the Closing, shall expire with, and be terminated and extinguished by, the Closing, and thereafter Seller shall not have any liability whatsoever with respect to any such representation, warranty, covenant or agreement. Each of the parties hereto intends to shorten the statute of limitations and agrees that no claims or causes of action may be brought against the other party arising out of, or based upon, any such representation, warranty, covenant or agreement. Under no circumstances shall Seller be liable for any monetary damages to Buyer hereunder, and return of the Deposit or specific performance shall be Buyer's exclusive remedy for Seller's default.  The provisions of this Section 12.12 and the other sections of this Article 12 shall survive the Closing.

12.13   Entire Agreement.  This Agreement sets forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby and constitutes a complete statement of the terms of such transactions.

12.14   Amendments.  This Agreement may be amended or modified only by written instrument duly executed by the parties hereto.

12.15   Governing Law.  This Agreement shall be governed by the laws of the State of Florida, exclusive of its choice of law principles.

12.16   Waiver.  Any term or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof, but only if such waiver is evidenced by a writing signed by such party.  No failure on the part of any party hereto to exercise, and no delay in exercising any right, power, or remedy created hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or remedy by any party preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.  No waiver by any party hereto of any breach of or default in any term or condition of this Agreement shall constitute a waiver of or assent to any succeeding breach of or default in the same or any other term or condition hereof.

12.17   Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

12.18  <u>Waiver of Jury Trial</u>.  **EACH PARTY TO THIS AGREEMENT WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.**

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

SELLER:

ADAMS STREET LOFTS, LLC

By:_____
Name:
Title:


BUYER:

GOVERNANCE SERVICES, LLC

By:_____
Name: PAIGE E CARTER-SMITH
Title: Managing Member

23

| Status | Property | Unit | Floorplan | Bedroom | Last Name | First Name | Lease Commencement | Lease Expiration | Prior Tenant Move Out Date | New Tenant Move In Date | Turn Date | Monthly Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Lease | Adams St. Lofts | 103 | P | 3 | Bhimani | Vipul | August 15, 2014 | 15-Aug-15 | Aug. 1 | Aug. 15 | Aug. 10 | $ 1,600.00 |
| New Lease | Adams St. Lofts | 201 | N | 1 | Lucaccio & Fulmer | Steffen & Heather | August 1, 2014 | 31-Jul-15 | Aug. 1 | Aug. 10 | Aug. 4 | $ 999.00 |
| New Lease | Adams St. Lofts | 202 | MH | 1 | Serra | Nicholas | August 1, 2014 | 31-Jul-14 | Jul. 31 | Aug. 6 | Aug. 4 | $ 1,200.00 |
| Renewed | Adams St. Lofts | 203 | C | 1 | Ellis | Adam | August 1, 2014 | 31-May-14 | X | | | $ 999.00 |
| New Lease | Adams St. Lofts | 204 | V | 1 | Randles | Theodore | August 1, 2014 | 31-Jul-15 | Jul. 15 | Aug. 1 | DONE | $ 1,100.00 |
| Renewed | Adams St. Lofts | 205 | MH | 1 | Allaw | Nehmd | August 1, 2014 | 31-Jul-15 | X | | | $ 999.00 |
| New Lease | Adams St. Lofts | 301 | N | 1 | John | Dejager | August 2, 2014 | 31-Jul-15 | Jul. 31 | Aug. 2 | Needs Punch | $ 1,200.00 |
| Renewed | Adams St. Lofts | 302 | MH | 1 | Belic | Christina | August 1, 2014 | 31-Jul-15 | X | | | $ 1,100.00 |
| New Lease | Adams St. Lofts | 303 | C | 1 | Prebser | Grant | August 1, 2014 | 31-Jul-15 | Jul. 30 | Aug. 1 | DONE | $ 1,199.00 |
| Renewed | Adams St. Lofts | 304 | V | 1 | Rodgers | Charles | August 1, 2014 | 31-Jul-15 | X | | | $ 1,099.00 |
| New Lease | Adams St. Lofts | 305 | T | 1 | Hamby | Tom | September 16, 2014 | 31-Jul-15 | Sep. 15 | Sep. 16 | Sep. 15 | $ 1,200.00 |
| Renewed | Adams St. Lofts | 306 | MH | 1 | Timmerman | Katie | August 1, 2014 | 31-Jul-15 | X | | | $ 1,192.00 |
| New Lease | Adams St. Lofts | 307 | S | 1 | Emmanuel | Chris | August 1, 2014 | 31-Jul-14 | Jul. 15 | Aug. 1 | DONE | $ 1,200.00 |
| Renewed | Adams St. Lofts | 501 | N | 1 | Manager Unit | Manager Unit | August 1, 2014 | 31-Jul-14 | X | | | $ 1,300.00 |
| Renewed | Adams St. Lofts | 503 | C | 1 | Brennan | Rodger | August 1, 2014 | 31-Jul-15 | X | | | $ 1,200.00 |
| New Lease | Adams St. Lofts | 504 | V | 1 | Carluccio | Thomas | August 1, 2014 | 31-Jul-15 | Jul. 15 | Aug. 1 | Needs Punch | $ 1,200.00 |
| Renewed | Adams St. Lofts | 506 | M | 1 | Adair | Eric | August 1, 2014 | 31-May-15 | X | | | $ 1,300.00 |
| | | | | | | | | Gross Monthly Rental Income: | | | | $19987.00 |
| | | | | | | | | Gross Yearly Rental Income: | | | | $239844.00 |

*On-Site Manager Unit is free rent in exchange

| Status | Property | Unit | Floorplan | Bedroom | Last Name | First Name | Lease Commencement | Lease Expiration | Prior Tenant Move Out Date | New Tenant Move In Date | Turn Date | Monthly Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Lease | | | | | | | | | | | | |
| Renewal | | | | | | | | | | | | |

| Owner # | Property | Unit/Address | Floorplan | Bedroom | Last Name | First Name | Lease Expiration | Move Out Date | Monthly Rent |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Adams St. Lofts | 103 | P | 3 | Mercurie | George | 31-Jul-14 | | $ 999.00 |
| 2 | Adams St. Lofts | 201 | N | 1 | Maurer | Zach | 31-Jul-14 | | $ 999.00 |
| 2 | Adams St. Lofts | 202 | MH | 1 | | | | | $ 999.00 |
| 2 | Adams St. Lofts | 203 | C | | Ellis | Adam | 31-Jul-14 | | $ 999.00 |
| 2 | Adams St. Lofts | 204 | V | 1 | Penrose | KyMee | 31-Jul-14 | | $ 999.00 |
| | | | | | Duvall | Steve | | | |
| 2 | Adams St. Lofts | 205 | M H | 1 | Alex | Vezina | 31-Jul-14 | | $ 999.00 |
| 2 | Adams St. Lofts | 301 | N | 1 | Shriver | Rebecca | 31-Jul-14 | | $ 1,070.00 |
| 2 | Adams St. Lofts | 302 | MH | 1 | Bello | Christina | 30-Jun-14 | | $ 999.00 |
| 2 | Adams St. Lofts | 303 | C | | Max | Schönberg | 31-Jul-14 | | $ 999.00 |
| 2 | Adams St. Lofts | 304 | V | | Rodgers | Charles Wm | 31-Jul-14 | | $ 1,050.00 |
| 2 | Adams St. Lofts | 305 | T | | Sievers | Ryan | 30-Sep-14 | | $ 1,070.00 |
| 2 | Adams St. Lofts | 306 | MH | 1 | Timmerman | Katie | 31-Jul-14 | | $ 1,022.00 |
| 2 | Adams St. Lofts | 307 | S | | Mueller | Chelsea | 31-Jul-14 | | $ 1,099.00 |
| 5 | Adams St. Lofts | 501 | N | 1 | Leoni | Marcus | 31-Jul-14 | | $ 1,200.00 |
| 5 | Adams St. Lofts | 503 | C | 1 | Behm | Rodger | 31-Jul-14 | | $ 1,200.00 |
| | | 504 | | Sutter | Jennifer | 16-Jun-14 | | $ 640.00 |
| 2 | Adams St. Lofts | 506 | M | | Adair | Erick | 12-Jun-14 | | $ 1,200.00 |
| | | | | | Adair | Amber | | | |
| | | | | | | Monthly Gross Rental Income: | | | $ 15,618.00 |
| | | | | | | Yearly Gross Rental Income: | | | $ 187,456.00 |

| New Lease | |
|---|---|
| Renewal | |